William DeMarco v. Commissioner.
De Marco v. Commissioner
Docket No. 55764.
United States Tax Court
T.C. Memo 1958-80; 1958 Tax Ct. Memo LEXIS 152; 17 T.C.M. (CCH) 394; T.C.M. (RIA) 58080; April 30, 1958
*152 Robert M. Taylor, Esq., and W. Howard Sharp, Esq., for the petitioner. Max J. Hamburger, Esq., for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined deficiencies in income taxes and additions to tax of the petitioner as follows: Additions to Tax
Taxable
Sec.
Year
Deficiency
Sec. 293(b)
294(d)(2)
1946
$ 588.43
$ 294.21
$ 57.15
1947
19,395.77
9,697.88
1,242.45
1948
501.78
250.89
151.34
1949
1,495.80
747.90
201.56
1950
611.81
305.90
129.16
Petitioner disputes the above determinations and additions to tax and denies any fraudulent intent to evade tax. The issues presented are: (1) Whether petitioner realized any taxable income during the years in question which he failed to report on his income tax returns. (2) If he did realize additional taxable income: (a) Whether the assessment of the deficiency for the year 1946 is barred by the statute of limitations. (b) Whether any part of the deficiencies is due to fraud with intent to evade the tax. Findings of Fact Some of the facts are stipulated and are hereby found as stipulated. Petitioner, William *153 DeMarco, is an individual residing in Vineland, New Jersey, and for each of the taxable years involved, 1946 to 1950, inclusive, he filed his individual income tax returns with the then collector of internal revenue for the first district of New Jersey at Camden, New Jersey. During the taxable years involved, petitioner was engaged in the business of selling and servicing new and used automobiles and parts in Vineland as an individual proprietor. During this period, petitioner operated under the trade names of "Stone and DeMarco" and "DeMarco Motors." The books were kept on the accrual basis of accounting. Petitioner's father, Emidio DeMarco, was born in Italy in 1876 and emigrated to the United States as a young boy. He lived first in Egg Harbor and Hammonton, New Jersey, where he attended a local school. After the completion of his schooling, he learned the glass-cutting trade and worked for various concerns in the area. He married and continued his trade as a glass cutter with the Skinner Glass Company. The surviving children born of this marriage are: Mamie, Jennie, Joseph, Rose, Vincent, William (petitioner in this case), Marie, Natalie, Charles, and Michael. Emidio owned *154 two farms near Hammonton, New Jersey, on which he grew principally blackberries and blackberry plants, raspberries, and other fruits. As soon as the children were old enough to work, usually about six to eight years of age, they were required to put in full time at the farms except when actually in school. The children did all of the planting, weeding, tending, and picking on the farms. Emidio acted as the foreman and spent time with the children to see that the work was done. At least one of the farms was very profitable. Blackberry plants were the chief product of that farm and they were in great demand. The children attended the nearby school but were taken out of school early in the spring of each year to work the farms and did not return until late in the fall, after the farming was finished. Emidio sold all of the crops from the farms and held the money for the family, never spending any of it. All of the clothing which the family used was made by Emidio's wife, Madeline, mostly from scraps of cloth and cheap clothing obtained by him. The home in Hammonton was surrounded by three lots on which the family was able to produce enough food to supply most of its needs. They grew *155 fruits and vegetables, tended fruit trees, and raised chickens, the latter being fed grass which the children collected from the neighborhood and the town. Emidio spoke Italian and English and was considered a good businessman. He earned money as an interpreter and business adviser for his friends and other Italian people who did not speak English. He handled real estate transactions for them and bought and sold real estate for himself. He also purchased fruit and produce at the railroad station from farmers and peddled it on the streets and to commission merchants in Philadelphia and New York. Joseph, the oldest boy, left school at the age of 14, and went to work with his father to learn the glass-cutting trade. Emidio kept Joseph's earnings for the family. However, the glass-cutting trade was seasonal and part of the year was spent on the farms and with the fruit and vegetable business. The records of the Skinner Glass Company indicate the following earnings for an Emidio DeMarco during the following years: Calendar
Year
Earnings
1910
$328.59
1911
531.63
1912
417.58
1913
551.45
1914
180.36
1915
76.49
1916
319.25
In 1917 Emidio left the Skinner *156 Glass Company and went to work for the Edison Company on war work. Some of the children worked with him, and he kept the wages earned by the children for the family. In 1919 the family moved to Philadelphia and purchased a home on 1131 Cross Street, Philadelphia. In 1921 they moved to 1121 Tasker Street, Philadelphia. At one time they lived at 6139 Vine Street to enable them to sell the house there. After the house was sold, they returned to 1121 Tasker Street. In Philadelphia, Emidio concentrated his efforts on the fruit business. He was in a partnership with another man. The two would purchase food as it arrived in Philadelphia at the docks and distribute it at the stores with which they had dealings. Emidio also owned a fruit stand which he operated. He secured the use of a small farm near Philadelphia which the family worked and he managed. Emidio was in a partnership with the owner of the farm to grow and sell the crops. The two shared equally the profits of the enterprise. Emidio charged for the labor which the family put into the farm before the profits were computed. However, he kept that portion of the earnings for the family. While in Philadelphia, the family continued *157 to work the farms in New Jersey. During the summers they lived on those farms, usually in the barns. As the children grew older, Emidio obtained positions for them in Philadelphia. Any monies they were paid were given over by them to Emidio. Emidio kept all of the money earned by the family. It was usually left lying around the house in any available place. It was stuffed in drawers, boxes, chairs, and on the shelves. However, no one in the family dared to touch any of it for fear that they would be severely punished by Emidio. He also kept large amounts of money on his person and wore a money belt filled with bills of various denominations. Prior to the depression of 1929, he kept some money in a building and loan association in Philadelphia. This money was withdrawn at the start of the depression and periodically Emidio gave large amounts to Rose to wrap and keep in a drawer in her desk at home. This drawer became the most cared-for family possession. Everyone in the family knew where the money was and was instructed to make sure that nothing ever happened to the drawer. In the case of a fire or any mishap, their only concern was to make sure that the drawer was removed safely. *158 Rose urged Emidio to put this money lying around the house and in the drawer in a bank, but Emidio distrusted banks and kept the money at home. After repeated arguments and discussions, he rented a lock box from the Broad Street Trust Company and put some of the family funds in it. In 1934, the family moved to Vineland, New Jersey, although Rose, who was a teacher in one of the Philadelphia schools, stayed in Philadelphia. Joseph and Vincent opened an undertaking establishment in Vineland shortly after the family moved there. The family helped them out financially while they were getting started in the business by paying bills and purchasing equipment, such as caskets, outer cases, and presses, and by acquiring a few cemetery lots. When the undertaking business in Vineland slacked off, Vincent moved to Atlantic City, New Jersey, where he set up an undertaking establishment of his own. The family helped him get started as they had Joseph. Jennie had left school at the age of 14 and with Emidio's help obtained a job in Philadelphia. She gave all of her earnings to Emidio. When she married, Emidio gave her a substantial undisclosed sum of money as a wedding gift and told her not to *159 mention anything about it to the family. Thereafter, she saw him repeatedly with great sums of money on him. On one occasion it appeared to her that he might have had as much as $80,000 on his person. On August 24, 1934, Emidio opened a postal savings account with the purchase of a $100 certificate. Thereafter, several certificates were purchased and small withdrawals were made. As the interest dates arrived, the certificates were cashed and the interest withdrawn. New certificates were purchased to replace those cashed at about the same date that the interest was withdrawn. On May 12, 1941, the date of the last withdrawal by Emidio, there was $1,400 left in the account. Emidio became a diabetic and thereafter did not engage in profit-making enterprises. Instead, he spent his time visiting various families, including those of his own children and of friends, in Philadelphia, Vineland, and Atlantic City. He usually stayed at one place for a few days at a time. On one occasion while visiting Joseph in Vineland, he took off his money belt and counted out $56,700 in Joseph's presence. He remarked at that time that there was more money elsewhere. There weeks before his death, Emidio *160 called Rose to his bed at Vincent's home in Atlantic City. He complained about an operation which he did not want performed and made her promise that it would not be forced on him. He then told her to go home and count the money in the desk drawer and said that it was about time the family began using the money for the things they needed. That night, Rose and her mother, Madeline, removed the money from the paper wrappings and counted out the money together. It amounted to $40,000. After Emidio died in January 1942, Rose deposited $20,000 of this money in a safe deposit box at the Broad Street Trust Company. Madeline, as the administrator of the estate of Emidio DeMarco, closed out the postal savings account. She filed an estate tax return with the State of New Jersey and reported only $1,500 as the total estate left by Emidio DeMarco. In answer to the question on the return as to whether the deceased had transferred any property two years prior to his death, she stated "No." Other records indicate no income or gift tax returns filed by either Emidio or Madeline DeMarco for any of the years 1930 through 1941, inclusive. William DeMarco, the petitioner, left school after completing *161 two years of high school. At the age of 17, he went to work for the American Stores Company as a manager of one of their grocery stores located at 24th and Dickinson, Philadelphia. Petitioner left Philadelphia and sought work in New York where, in 1930, he managed a store for Sheffield Farms, a dairy concern. Later he left Sheffield Farms and entered the undertaking business. Shortly thereafter, he returned to Philadelphia and worked in an undertaking establishment there. About one year after the family moved to Vineland, New Jersey, William moved to Vineland and assisted his brothers in the undertaking business. When there was not enough business for all, William became associated with Walter Stone in an automobile agency which at first sold Willis and Graham-Paige automobiles. The agency was organized originally as a corporation, but was dissolved and a partnership was formed. In 1941 the agency changed to selling Dodge and Plymouth automobiles for the Chrysler Corporation. Petitioner's partner, Walter Stone, died in 1944, and petitioner continued the auto business as sole proprietor. The Chrysler Corporation informed petitioner that he no longer held an agency franchise, but that *162 he could continue to operate and would be granted a new franchise if he would build a new building for the business. At that time, the business was being operated at East and Landis Avenues in Vineland, New Jersey. Petitioner acquired a new lot at West and Landis Avenues for the purpose of constructing a new building as requested by the Chrysler Corporation. Plans were adopted for the new building in the latter part of 1946. Petitioner obtained a bank loan in the amount of $15,000, $5,000 of which was received in the fall of 1946, and the other $10,000 in 1947. The building was completed in the spring of 1947 and the business was moved into it in April of that year. The cement, stone, brick and steel building consisted of a garage, showroom, two offices, a parts department, and a small office upstairs. In the latter part of 1947, petitioner moved his living quarters into the upstairs office. He lived in that office until 1950, when he moved into his own home at Main and Washington Streets, Vineland, New Jersey. Repayment of the $15,000 loan from the bank was completed by 1950. Petitioner hired Virginia Bailey as a bookkeeper for the business in the fall of 1946. She recorded the *163 sales of the automobiles from the information given her by petitioner. Petitioner would give her the cash proceeds from the sales and she would prepare the deposit slips. At the same time she entered in the books the amount of checks, cash, trade-ins, and additional features of the sales price. The deposit tickets were taken to the bank by petitioner at the end of each day. In addition to the usual records, the agency was required to send information of each sale to the factory. The agency was charged $5 for each automobile delivered by the factory, and would receive this money back after the auto was sold. The information sent to the factory was filed on a Retail Delivery Record (hereinafter called R.D.R.). These records were filed by both the bookkeeper and the petitioner. The information on the R.D.R. was not necessarily the same information entered in the books, although both were recorded from the same sale. Automobiles were difficult to obtain, and petitioner would receive delivery of a new automobile only after he had informed the factory of a sale of one previously delivered. In order to obtain deliveries under these circumstances, petitioner would occasionally prepare R. *164 D.R.'s on the basis of fictitious sales. Such an R.D.R. would contain a fictitious sales price, and the purchaser's name would be that of a friend or would be fabricated. These fictitious sales were never entered on the regular books of petitioner, and the financial reports required by the Chrysler Corporation, which were prepared by petitioner, likewise never included any of these fictitious sales. At the end of the year 1946, petitioner retained Charles Rice, an accountant, to prepare his tax returns for the calendar year 1946. He informed the accountant that certain additional investment items on the statements forwarded to the Chrysler Corporation were in reality loans from his family. The accountant then made adjustments to the tax returns so as not to include the items as additional income for the year. In September 1947, petitioner hired a new full-time bookkeeper named Lillian Brunner. She continued the work of Virginia Bailey, keeping the account books, cash receipts and disbursements, general ledger, and, in addition, made out the financial reports. She also prepared all of the R.D.R.'s forwarded to the factory, including the ones based on fictitious sales. She took monthly *165 inventory of the automobiles and parts as required by the Chrysler Corporation, and she prepared the weekly progress sheets showing the actual sales of automobiles. The accounts of the business were kept in one book at that time. About the same time that petitioner hired the new bookkeeper in 1947, the Chrysler Corporation prevailed on him to adopt their system of bookkeeping. The new system required some changes in the accounts, primarily in the manner of entering a transaction on the books. When petitioner adopted the Chrysler method, he was required to file a balance sheet with the corporation as of the date of the changeover. His accountant, Charles Rice, compiled this initial balance sheet from working papers prepared by the bookkeeper. The balance sheet as forwarded to Chrysler did not show any items as loans from members of the petitioner's family, which loans are found below to have been in fact received. The balance sheet simply reflected these amounts as capital because it was petitioner's desire to present a picture of high investment to Chrysler. Aside from this misrepresentation, the balance sheet was accurate. During the 1947 calendar year petitioner had the following *166 automobile transaction with Simon M. Cherivtch, a used-car dealer in the Vineland area: Date of Sale
Make
Model
Serial Number
Motor Number
Sales Price
2/27
Dodge
'47 Express
81174384
T112-149472
$1,400
3/24
Dodge
'47 1 Ton
81227921
T116-91934
1,700
5/20
Dodge
'47 Coupe
30866597
D24-232651
1,850
5/21
Dodge
'47 Coupe
30869354
D24-235712
2,300
5/23
Dodge
'47 4 Door
30864928
D24-230161
2,300
5/29
Plymouth
'47 5 Pass.
11717312
P15-386344
1,900
At the request of his bookkeeper, Lillian Brunner, petitioner retained Marcus Leiberman, a practicing accountant, to prepare his yearly financial reports and tax returns. The financial reports were prepared from the balances prior to the adjusting entries for the year-end and did not reflect the usual accruals. These reports were forwarded to the Chrysler Corporation at about the same time petitioner's tax returns were prepared. Included in the adjusting entries for each year, were entries transferring amounts from an investment account to a loans payable account. As a result, the balance sheet filed with the Chrysler Corporation differed from the tax returns in the amount of the *167 adjusting entries, mainly to the extent of the loan account. For the years in question, petitioner's net worth, his living expenses, and his adjusted gross income as reported on his tax returns, were as follows: Net Worth
Reported Adj.
Taxable Year
Net Worth
Increase
Living Expenses
Gross Income
1946
$ 39,846.45
$ 3,230.08
1947
79,804.56
$39,958.11
$ 5,000.00
9,277.91
1948
90,332.56
10,528.00
6,874.66
16,189.45
1949
100,612.51
10,279.95
9,145.99
15,925.94
1950
105,803.04
5,190.53
11,092.32
14,782.85 The petitioner's net worth in each of the years, as shown above, is based on the financial reports forwarded to the Chrysler Corporation in the ordinary course of the taxpayer's business. Thus, petitioner's net worth, as so computed, includes the loans received from members of his family. The net worth increase and living expenses for the years involved, not reflected in the adjusted gross income as reported on petitioner's return, are due primarily to the following loans petitioner received from members of his family and which were stated as increased investment in the statements forwarded to the Chrysler Corporation: Method
Relation
Date of Loan
Amount
of Payment
Received From
to Taxpayer
10/29/46
$ 800
Check
Rose DeMarco
Sister
11/ 4/46
2,000
Check
Rose DeMarco
Sister
2/20/47
2,000
Cash
Rose DeMarco
Sister
2/25/47
10,000
Check
Rose DeMarco
Sister
4/15/47
3,600
Check
Rose DeMarco
Sister
5/23/47
1,600
Cash
Natalie DeMarco
Sister
5/28/47
2,000
Cash
Mary DeMarco
Sister
7/ 2/47
3,200
Cash
Mary DeMarco
Sister
1/22/48
1,800
Cash
Madeline DeMarco
Mother
12/13/49
3,500
Cash
Rose DeMarco
Sister
*168 The above loans occurred because petitioner needed working capital, partly due to the cost of his new building. After receiving a bank loan of $15,000, the only source from which petitioner could obtain these additional funds was his family. The latter had available for this purpose the $40,000 which petitioner's father Emidio had kept in Rose's desk drawer at the home in Vineland. While this money belonged to the family as a whole, Rose was, in practice, its actual custodian and decided how it was to be employed. For each check or cash amount that the petitioner received, he gave a demand note payable to the individual who paid him the cash or drew him the check. In each case, these demand notes were executed contemporaneously with the receipt of the loan. None of the loans has been repaid, nor has any attempt been made to collect on them. When petitioner was in need of a family loan, he would tell Rose, usually by telephone. When the loan was made in cash, the money was placed in a brown envelope which was then handed to petitioner. If Rose was not at home when petitioner called for the money he had requested, one of the other members of the family present would hand it over *169 to him. When petitioner was paid by check, Rose would draw a check on her personal account at the Central Penn National Bank of Philadelphia and then deposit that amount in her account to cover the check. The amount so deposited was drawn either from the $20,000 kept in the safe deposit box or from the $20,000 kept at home. On one occasion after Rose had turned over $3,600 to petitioner, she began to worry whether any of the loans would ever be repaid. She expressed this concern in a discussion with the petitioner and, as a result, he returned the particular $3,600 loan to the family funds. Madeline then reprimanded Rose for her conduct which the mother considered selfish, and Rose returned the loan to petitioner. In addition to the above loans, petitioner borrowed $1,500 from Michael in the fall of 1950 and repaid that loan a few months later. Petitioner and Rose had several discussions about repayment of these loans, some of these discussions being heated arguments. On one occasion, petitioner's bookkeeper, Lillian Brunner, overheard an argument between the two concerning the loans. On another occasion when Rose visited petitioner's business premises, she specifically told this *170 same bookkeeper that she was making loans to the petitioner. Petitioner did not realize additional items of taxable income in the taxable years 1946, 1948, or 1949, which he failed to report on his tax returns for those years. Petitioner did realize additional taxable income of $13,280.20 in 1947 and $1,500 in 1950, which he failed to report on his tax returns for those years. The deficiencies for 1947 and 1950 are not due to fraud with intent to evade tax. Opinion The issues in this case are largely questions of fact. The primary dispute relates to whether loans were in fact received by petitioner from members of his family. We have found that petitioner received the following amounts as loans from the family during the years in question: Total Loans
Taxable
During
Year
Taxable Year
1946
$ 2,800
1947
22,400
1948
1,800
1949
3,500
1950
1,500 Moreover, we have found that the loans were made out of some $40,000 accumulated by the family prior to Emidio's death, which money was held by Emidio, not as his, but because of his position as the head of the family. The loans for the years 1946 through 1949, inclusive, account for the additional net worth *171 for each of those taxable years, except for 1947, when there was an increase in the capital of petitioner's business in the amount of $35,680.20. Since only $22,400 of this amount was received in the way of loans from the family, and petitioner has not attempted to explain the other $13,280.20 of the increase, we have found as a fact that the unexplained amount was additional unreported taxable income for that year. Respondent has conceded, on brief, that, if the loans were in fact received, there was no fraud in the failure to report the additional income. Respondent has also conceded the section 294(d)(2) additions to the tax for that year, and the other years in which no deficiency exists. The $1,500 loan which petitioner received in the taxable year 1950 was not outstanding at the end of that year. There existed some $5,190.53 increase in net worth for that year, none of which is attributable to family loans. Petitioner disputes the correctness of respondent's determination that he had $11,092.32 in living expenses for the taxable year 1950, but has introduced no evidence to indicate that that figure was incorrect. His only defense was that the manner in which respondent determined *172 the amount of living expenses was arbitrary and without substance. The fact that respondent's determination is based on unsound reasoning, does not destroy the presumption that it is correct. . Petitioner's living expenses were found to be $11,092.32 for the taxable year 1950. The living expenses of $11,092.32 and the increase in net worth of $5,190.53 for that year indicate that petitioner had adjusted gross income of $16,282.85 in 1950, $14,782.85 of which he reported on his return for that year. There remains an unreported amount of $1,500 for the 1950 taxable year. However, we have found no evidence of fraud in the failure to report that amount. Petitioner argues that respondent does not have the right to use the net worth method to compute petitioner's net worth and thereby arrive at corrected taxable income when books and records exist. This contention has recently been decided against the taxpayer by the Supreme Court in , rehearing denied (1955). Decision will be entered under Rule 50.